IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 1:98-cr-00019-MP-AK

ROBERT PETRIE,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

        This matter is before the Court on Doc. 1457, Third Amended Motion to Vacate under 28

U.S.C. § 2255, by Robert Petrie.  Defendant has also filed a motion for Rule 11 sanctions with

supporting memorandum.  Docs. 1471 &1472.  The Government has filed its response, Doc.

1465, and Defendant has filed his reply.  Doc. 1467.  This cause is therefore in a posture for

decision.  Having carefully considered the matter, the Court recommends that the third amended

motion to vacate be denied.

## BACKGROUND

        Defendant Robert Petrie and eleven others were indicted for conspiracy to commit money

laundering to promote wire fraud in violation of 18 U.S.C. §§ 1956(h) and 2, covering a period

from January 1, 1991, through the date of the superseding indictment, April 27, 1999.  Doc. 225.

Defendant proceeded to trial, and as summarized by the Eleventh Circuit, the testimony revealed

the following:

> [T]he members of the conspiracy advertised and promoted the availability of
> venture capital funding through the national and international news media.
> Persons who responded to these offers were initially instructed to submit financial
> information to a "broker" working for the organization.  The broker made sure
> that the prospective borrower could afford an up-front fee, which typically ran
> into the thousands of dollars.  Thereafter, the borrower was refereed to a

"syndicator" for the purpose of entering into a funding contract.  Upon execution of the contract, the up-front fee was placed in an escrow account pending satisfaction of certain conditions.  A key condition was that the borrower had to obtain a payment guarantee, in the form of a letter of credit, from a financial institution within several days of execution of the contract.  Obtaining the guarantee required some form of collateral, which, in every instance, the prospective borrower was not able to provide.  This resulted in a default on the contract and forfeiture of the up-front fee.  At that point, the money was moved to an off-shore financial institution and distributed to the members of the conspiracy.

Testimony from victims and member of the organization established that Petrie participated fully in the scheme and that he profited from it.  In addition, Petrie formed his own company in Saint Martin, Netherlands Antilles–"B&L Syndicators," also known as "B&L Securities"–as a vehicle to increase his profits from the criminal enterprise.  For sentencing purposes, the district court determined that Petrie, individually and through his company, was responsible for laundering $22,968,446.00.

*United States v. Petrie*, 302 F.3d 1280, 1283 (11th Cir.), *reh'g* and *reh'g en banc denied*, 54 Fed.

Appx 935 (11th Cir. 2002), *cert. denied*, 538 U.S. 971 (2003).

The jury found Defendant guilty, and the Court sentenced him to 188 months

imprisonment.  Defendant appealed, raising, in pertinent part, the following issues:  (1) the Court

erred in excluding the testimony of two lawyers and a secretary at B&L Securities; (2) the Court

erred in excluding the testimony of an expert witness; (3) the Court erred in allowing a defense

witness to invoke the Fifth Amendment; (4) the Court erred in admitted B&L Securities records

received by the Government during trial; (5) the Court erred in the manner it summoned the jury

panel and excused potential jurors; (6) the Court erred in holding him responsible for the total

fraud loss in violation of *Apprendi*; (7) the Court erred in imposing a ten-level sentencing

enhancement based on the amount of the loss; and (8) the Court erred by failing to make

particularized findings concerning the scope and foreseeability of the conspiracy.

The Eleventh Circuit rejected each of these arguments and affirmed the conviction and

sentence.[1]  *Petrie*, 302 F.3d at 1291.

While the certiorari petition was pending, Defendant, acting *pro se*, filed a motion to

reverse his conviction and to dismiss the indictment pursuant to Fed. R. Crim. P. 12(b) for lack

of jurisdiction.  Doc. 1332.  More specifically, Defendant charged that the superseding

indictment failed to show that any acts occurred in the Northern District of Florida or to charge

an offense because the Government omitted a material element from Count One.  *Id*.  He claimed

that counsel failed to raise this "jurisdictional defect" either before trial or on appeal.  *Id*.  The

Court denied the motion, finding:

> [T]he very first overt act involves a fax from [co-defendant] Harry Alonso to
> Larry Sangaree which was received in Waldo, Florida, which is in the Northern
> District of Florida.  Indeed, the trial was replete with testimony and evidence
> regarding Mr. Sangaree's extensive activities in the Northern District of Florida,
> and the Superseding Indictment repeatedly alleges that various aspects of the
> conspiracy took place in the Northern District.

Doc. 1334.  The Court did not, however, specifically address the second basis for dismissal.

Defendant appealed this order.  Doc. 1340.

Defendant then filed a "Motion to Correct Clerical Error Pursuant to Rule 36,

F.R.Crim.P., or in the Alternative, Reverse Conviction Pursuant to Rules 52(b) and 33, F.R.

Crim. P."  Doc. 1337.  In this motion, Defendant requested that the Court amend the judgment to

include aiding and abetting or, alternatively, to reverse his conviction "due to a lack of a

'unanimous verdict' that he is guilty of Count One as charged by the grand jury."  *Id*.  Defendant

erroneously believed that aiding and abetting was a separate charge for which he had to be found

guilty in order to sustain a conviction on Count One, and he faulted counsel for having failed to

---

[1]Though not relevant for the instant proceedings, the appellate court vacated a
preliminary order of forfeiture.  *Petrie*, 302 F.3d at 1284-85.

raise this issue.  *Id.  See United States v. Hornaday*, 392 F.3d 1306, 1313 n.3 (11th Cir. 2004) (finding it is "obvious truism" that if defendant personally commits offense, he is punishable as principal); *United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir. 1984) (Section 2 of Title 18 does not establish separate crime, "but rather an alternative charge that permits one to be found guilty as a principal for aiding or procuring someone else to commit the offense," thereby allowing jury to find defendant guilty "even though he did not commit all the acts constituting the elements of the substantive crime aided").

The Court denied the motion without comment, Doc. 1338, and Defendant appealed this order as well.  Doc. 1346.  The appeals were later consolidated.  *United States v. Petrie*, No. 03-12201 (11th Cir.) (May 22, 2003, order consolidating appeals).

In addition to challenging the Court's subject matter jurisdiction, Defendant, in pertinent part, argued on appeal that his conviction was obtained in violation of the Ex Post Facto Clause[2] and that the superseding indictment was defective because it failed to set forth the elements of 18 U.S.C. § 2.

The Eleventh Circuit affirmed, rejecting the second argument as meritless and warranting "no additional discussion."  Doc. 1399.  It also rejected Defendant's argument that the Court lacked subject matter jurisdiction over the superseding indictment but found that "[t]o the extent Petrie's Rule 12(b) motion raised issues other than those outlined in Rule 12(b)(3)(B), the district court lacked jurisdiction to hear the motion because Petrie was required to file such a

---

[2] By Defendant's own admission, this argument was not previously raised in this Court but was pressed upon the Eleventh Circuit as a "more serious 'jurisdictional issue,' which the Court may want to review 'sua sponte' in the best interest of preserving scarce judicial resources,"  Doc. 1465, Ex. B at *13, and later as a plain error issue which the appellate court should consider.  Doc. 1454, Ex. C at *3.

motion before the start of trial." *Id*.

While the appeals were pending, Defendant filed a motion to dismiss the superseding indictment based on prosecutorial misconduct before the grand jury.  Doc. 1369.  In this motion, Defendant argued, *inter alia*, that because the grand jury was led to believe that the money laundering conspiracy lasted from January, 1991, to April 28, 1999, an impossibility since § 1956(h) did not become effective until October 28, 1992, it violated Defendant's rights under the Ex Post Facto Clause.  Doc. 1369.  The Court denied the motion without comment.  Doc. 1377. Thereafter, Defendant moved for reconsideration.[3]  Doc. 1381.

As noted, this cause is presently before the Court on Defendant's third amended motion to vacate.  Doc. 1457.  On this occasion, Defendant raises the following issues, each of which will be considered in turn:

1. Conviction obtained by violation of privilege against Ex Post Facto Clause violation;

2. Defective indictment–failure to set forth elements of 18 U.S.C. § 2 and to set forth scheme or artifice to defraud;

3. Sentence based on conspiratorial conduct which occurred before enactment of 18 U.S.C. § 1956(h);

4. Denial of effective assistance of counsel;

5. Illegal sentence due to judge's reliance on facts not found by jury or admitted by Defendant in imposing sentence above maximum permitted by verdict.

**DISCUSSION**

I.      Violation of Ex Post Facto Clause.

_____

[3]At some point, this motion was terminated, as it does not appear as an active motion on the Court's docket.  There is no written order terminating it, however, and neither the undersigned nor the Clerk has been able to determine the genesis of its termination.

In this claim, Defendant charges that his conviction for money laundering violated the Ex Post Facto clause because the superseding indictment charged him with the commission of overt acts preceding the effective date of the money laundering statute and the jury was never specifically instructed to find Defendant "was involved in the conspiracy after [the] effective date of [the] statute." Doc. 1457 at 4.

The failure to raise an ex post facto defense at trial "waives any future use of such defense." *United States v. LeQuire*, 943 F.2d 1554, 1564 (11th Cir. 1991). To the extent that the ex post facto challenge here alleges a defect in the indictment, *see United States v. Brown*, 555 F.2d 407, 414 (5th Cir. 1977), it is included within the Rule 12(b)(3)(B) defenses which must be raised before trial. Because this claim was disposed of by the Eleventh Circuit in the consolidated appeals of Defendant's post-appeal motions and decided adversely to Defendant, *see* Doc. 1399 at 3 n.2, this Court is not required to reconsider it in this proceeding. *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000).

Alternatively, the charges in the superseding indictment did not violate the Ex Post Facto Clause because Defendant was charged with a conspiracy that continued long after 1992, the effective date of the statute prohibiting conspiracy to money launder. *United States v. Hersh*, 297 F.3d 1233, 1244 (11th Cir. 2002). Indeed, the superseding indictment specifically alleges the commission of certain overt acts from 1994-1997, which is plainly sufficient to distinguish this case from *United States v. Miranda*, 197 F.3d 1357 (11th Cir. 1999), wherein the alleged money laundering conspiracy had ended before 1992.

The Court is uncertain whether Defendant presented the instructions portion of this claim to the Eleventh Circuit (it does not appear in any of the pages of Defendant's appellate briefs

cited by the Government).  Nevertheless, it is plainly without merit.  The "on or about"

instruction given to the jury in this case, Doc. 733 at 24, is plainly the accepted pattern

instruction regarding the Government's burden related to proving the date of an alleged offense,

*see* Basic  Instructions 9.1 *Eleventh Circuit Pattern Jury Instructions–Criminal* (2003), and thus,

the Court's failure to instruct the jury that it could not return a guilty verdict  "unless the

Government demonstrated the existence of a conspiracy of which the [defendant] was a member

after October 28, 1992," Doc. 1457, Mem. at 14, is of no consequence and certainly does not

violate the Ex Post Facto Clause.

> II.     Failure of superseding indictment to set forth elements of 18 U.S.C. § 2 and
>         nature of scheme or artifice to defraud.

The first portion of this claim was considered and flatly rejected by the Eleventh Circuit,

Doc. 1399, and will not be reconsidered on this occasion.  As previously noted, however, the

claim is patently meritless.  *See supra* at 3-4.

As to the second portion of this claim, i.e., that the superseding indictment "failed to

notice the [Defendant] what the 'scheme or artifice' to defraud is and denied him the opportunity

to properly prepare a defense," is a challenge which can be made at any time while the case is

"pending."  *United States v. Sharpe*, 438 F.3d 1257, 1258 (11th Cir. 2006).  However, this case is

no longer "pending" as that term is defined in Fed. R. Crim. P. 12(b)(3)(B), *see* Doc. 1399 at 4

(case is "pending" until judgment is final), and thus, Defendant has waived the issue.  Fed. Rule

Crim. P. 12(e).

Alternatively, the claim is without merit.  The sufficiency of a criminal indictment is

determined from its face to ascertain whether it contains the elements of the offense intended to

be charged and "'sufficiently apprise[s] the defendant of what he must be prepared to meet.'"

*Sharpe*, 438 F.3d at 1263 (citation omitted).  While the indictment must set forth sufficient facts and circumstances to inform the defendant of the specific offense charged, it need not allege in detail the factual proof to be relied upon in support of the charge.  *Id*. at 1263, 1263 n.3.  Those details can be discovered through a bill of particulars.  *Id*. at 1263 n.3.  The superseding indictment here clearly meets these requirements.

      III.      Sentence based on conspiratorial conduct which occurred before enactment of 18 U.S.C. § 1956(h).

      In this claim for relief, Defendant maintains that in sentencing him, the Court relied on "'misinformation' or 'questionable information' which should have been weighed and found by a jury, i.e., the jury, had it been properly instructed, could have found the amount of loss occurring prior to October 28, 1992, and that occurring after October 28, 1992."  Doc. 1457, Mem. at 22.  This precise claim was presented to the Court at sentencing and rejected.  On appeal, it formed the basis of an *Apprendi* claim and an attack on the ten-level enhancement of Defendant's base offense level.  Both arguments were rejected by the Eleventh Circuit.  Because the 188-month sentence was less than the statutory maximum, *Apprendi* was not applicable. *Petrie*, 302 F.3d at 1289-90.  Furthermore, the Court

> did not clearly err in calculating the amount of money laundered given Petrie's involvement in contacting clients and introducing them to the scheme to defraud them and his establishment of a company–B&L Securities–used to defraud clients at later stages of the conspiracy....[B]oth the record and the sentencing court's pronouncement provide a sufficient basis to uphold the sentence imposed upon Petrie.

*Id*. at 1290-91.  Pursuant to *Nyhuis*, this Court will not reconsider those findings.  The Court notes, however, that the jury did in fact find Defendant responsible for a loss of $24,000,000.00.  Doc. 736.  While the Eleventh Circuit vacated the order of forfeiture, it did so not because there

was a question about the amount but because the procedures for ordering forfeiture were not followed.  *Petrie*, 302 F.3d at 1284-85.  Finally, to the extent that Defendant is asserting *Blakely/Booker* error, the argument is not well taken, as neither applies to matters on collateral review.  *Varela v. United States*, 400 F.3d 864, 868 (11th Cir. 2005).

IV.     Denial of effective assistance of counsel.

Defendant next alleges eleven instances of ineffective assistance of counsel.  Thus, a review of  *Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy.  *Strickland*, 466 U.S. at 686.  The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong.  *Id*. at 697.  The court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice.  *Id.; see also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual support for his contentions that counsel's performance was constitutionally deficient.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  The court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance.  *Strickland*, 466 U.S. at 689-90.  To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take."  *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted).  "An ambiguous or silent record is not

sufficient to disprove the strong and continuing presumption...that [counsel] did what he should have done and that he exercised reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions." *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001). "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy." *Chandler*, 218 F.3d at 1315 n.16. "No lawyer can be expected to have considered all of the ways [to provide effective assistance]." *Id*. Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id*.

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*. Additionally, prejudice is established only with a showing that the result of the

proceeding was fundamentally unfair or unreliable.  *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between."  *Chandler*, 218 F.3d at 1313 (11th Cir. 2000).  This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether a reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

    A.    Failure to move for dismissal of superseding indictment based on changes from the original indictment.

This claim is patently frivolous.  As long as the purpose of the superseding indictment is not to harass a defendant, the prosecutor may seek a superseding indictment at any time prior to trial on the merits.  *United States v. Barner*, 441 F.3d 1310, 1315 (11th Cir. 2006).  Defendant makes no allegation of improper purpose, and thus, the Government was free to supersede the original indictment at any time.  A superseding indictment does exactly what its name implies, "supersedes," or replaces, the original indictment.  It is precisely the time for the Government to "fine tune" language, make changes, and elaborate on or delete allegations.  Counsel was therefore not ineffective for failing to move to dismiss the superseding indictment merely because it made changes or additions to the original indictment.

    B.    Failure to move for dismissal based on "numerous defects in the statutory construction of the conspiracy count," including the failure to define the "scheme or artifice to defraud."

The Court has previously found that the superseding indictment sufficiently apprised Defendant of the conspiracy charge against him, and thus, counsel was not ineffective for failing to attack a valid indictment.

C.    Failure to move for dismissal of the superseding indictment based on "duplicity stemming from charging...conspiracy and aiding and abetting."

As previously noted, aiding and abetting is not a separate crime but simply makes one who aids and abets the commission of a crime punishable as a principal.  It is an alternate charge in every indictment, regardless of whether it is explicitly stated.  *See Martin*, 747 F.2d at 1407. Therefore, counsel did not act deficiently if failing to seek dismissal of the superseding indictment on this ground.

D.    Failure to move for dismissal of superseding indictment based on prosecutorial misconduct. before grand jury.

In this claim, Defendant charges that the Government "knowingly and intentionally misled the grand jury in at least four (4) specific instances and that had counsel investigated the grand jury deliberations, he would have discovered the Government's misconduct."  Doc. 1457, Mem. at 29.  He then lists five ways in which he believes the grand jury was misled.  *Id*. at 29-30.

In response, the Government has submitted the affidavit of trial counsel, Richard Rosenbaum.  Doc. 1465, Ex. F.  With regard to this allegation, Mr. Rosenbaum states that he "was unaware of any prosecutorial misconduct before the grand jury and did not possess facts which could establish such a claim."  *Id.*

In deciding whether to indict an individual, the grand jury need find only that there is probable cause to believe that a crime was committed and that the defendant was the person who committed the crime.  *United States v. Jennings*, 991 F.2d 725, 729 (11th Cir. 1993).  The Government is under no duty to present exculpatory evidence to the grand jury.  *United States v. Williams*, 504 U.S. 36, 51-55 (1992).  Errors in the grand jury proceedings do not generally

warrant dismissal unless the defendant is prejudiced thereby.  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).  "[D]ismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."  *Id.* at 256.  A subsequent finding of guilt by the petit jury renders any error in the grand jury proceedings harmless beyond a reasonable doubt.  *United States v. Mechanik*, 475 U.S. 66, 70 (1986).

In this Court's view, the alleged instances of prosecutorial misconduct before the grand jury are nothing more than another attempt by Defendant to attack (1) the legal validity of the superseding indictment itself (the superseding indictment violated the Ex Post Facto Clause and the Court lacked jurisdiction over the charges) or (2) the factual bases of matters which the Government ultimately proved to the petit jury (the overt acts were not fraudulent; the conspiracy ended before the date charged in the superseding indictment; and the fraudulently obtained funds were not used with the intent to promote the commission of unlawful activity). This is not prosecutorial misconduct, and thus, counsel did not act deficiently in failing to attack the superseding indictment on this basis.

E.      Failure to object to constructive amendment of  superseding indictment.

In this claim, Defendants charges that the Government and the Court constructively amended the superseding indictment to provide the "missing 'scheme or artifice to defraud.'" Doc. 1457, Mem. at 31.  He bases this allegation on arguments made by counsel–"this case is about 'up front fees,' 'multi-million dollar loans that never close,' 'lies and alibis,' and 'contracts designed to have a potential borrower lose funds'"–and instructions from the

Court–"this case is about 'sources held out to be funding sources' and 'ability to fund'"–matters

which were not "mentioned in the superseding indictment." *Id*.  In Defendant's view, these

statements constructively amended the superseding indictment, thereby denying him a fair trial.

*Id*.

A constructive amendment of an indictment occurs when the essential elements of the

offense charged in the indictment are altered to broaden the possible bases for conviction beyond

what is contained in the indictment.  *United States v. Narog*, 372 F.3d 1243, 1247 (11th Cir.

2004).  The statements cited by Defendant simply did not act to broaden the scope of the charges

against him, as they merely explained to the jury the nature of the alleged fraudulent scheme

underlying the money laundering conspiracy at issue.  Counsel was not ineffective for failing to

challenge these statements.

      F.      Selection of biased juror.

In this claim for relief, Defendant charges that counsel acted ineffectively in allowing a

juror with a stated bias in favor of the Government to sit on the jury in this case.  Doc. 1457,

Mem. at 32.  More specifically, Defendant points to the selection of Randall Winegardner, who

advised the Court that he had friends who had lost all of their life savings in a money scam.  In

response, Mr. Rosenbaum states the decision to accept Mr. Winegardner as a juror was a

strategic and tactical decision made in consultation with Defendant and other professionals and

was based on a number of factors, including Mr. Winegardner's age, his apparent business

acumen, and his overall appearance and demeanor.  Furthermore, in determining how to exercise

his peremptory challenges, counsel "feared that if Juror Winegardner were stricken, the next few

jurors in line were not good for the defense" because, in part, of their close personal ties to law

enforcement.  Doc. 1465, Ex. F.  In Mr. Rosenbaum's professional judgment, Mr. Winegardner

"would be a fairer, more impartial juror than those 'next in line.'"  *Id*.  Mr. Winegardner was

eventually selected as the jury foreperson.

While Defendant characterizes Mr. Winegardner's answers to the Court's questions as an

"insistence that he would be 'biased' in a trial of this nature," this is a blatant  misrepresentation

of Mr. Winegardner's statements to the Court and an incomplete review of the proceedings.

After disposing of certain preliminary matters, the Court explained the nature of the

charges and asked:

> Now, is there anything about the nature of this particular charge, that is, the
> charge of a conspiracy to violate the money laundering statutes, that any of you
> believe that–or have such personal feelings concerning that particular charge that
> you would not be able to sit fairly and impartially as a juror that hears the
> testimony and makes the decision as to that particular allegation?  Anything about
> a money laundering or conspiracy charge that you feel would make it difficult for
> you to sit fairly and impartially is what I'm saying?  No one.

Doc. 1015 at 59-60.  The Court then inquired as to  whether any jurors, their family members, or

their close personal friends had been the victim of a crime.  Mr. Winegardner indicated that his

home had been "broken into" and more pertinently, that he had "friends [who]  were in a money

scam out of Holland that they lost money–had to declare bankruptcy from losing all of their

money."  *Id*. at 93.  According to Mr. Winegardner, his friends invested much of their life

savings and "didn't get what was promised back and ended up having to declare bankruptcy."

*Id*. at 93-94.  In response to the Court's question as to whether he thought this incident "might

influence you in any verdict you may reach in this trial, when you will hear testimony from

individuals who say that they invested and lost money," Mr. Winegardner acknowledged the

possibility:  "Yes.  It is hard to say.  I couldn't say a hundred percent, you know, because it's

removed from me.  It wasn't my money or anything.  But, because they were close friends, I felt

really bad for them losing all of their money because they got scammed."  *Id.* at 94.

This is hardly an "insistence" of bias, and counsel's reasons for accepting Mr.

Winegardner are perfectly reasonable and well within the range of what other counsel would

have done under similar circumstances.  Counsel's candid acknowledgment to this Court and

possibly to others, *see* Doc. 1467, Ex. A & E, that the selection of Mr. Winegardner may not, in

hindsight, have been the best decision, does not alter the Court's decision, as the Court must

judge counsel's performance in light of all of the circumstances as they existed at that time, not

through the lens of today or even immediately post-trial.  Because counsel did not act deficiently

by allowing Mr. Winegardner to be seated as a juror in this case, he was not ineffective in this

regard.

G.     Failure properly to advise Defendant of sentencing exposure.

Defendant next contends that counsel advised him that under *Apprendi* he was facing

under ten years imprisonment by going to trial "because the indictment failed to specify the

quantity of the fraud loss or state what managerial role he had in the conspiracy; therefore, either

the indictment would be dismissed or he would receive a low prison sentence."  Doc. 1457,

Mem. at 33.  In response, counsel, who readily acknowledges his continued pressing of

*Apprendi*, rejects the notion that he misled Defendant regarding his sentencing exposure and

points out that Defendant "was repeatedly made aware of the maximum penalty for conspiracy to

launder money" via the Court, discussions of "various plea offers...even the day before the third

trial commenced," and a "sentencing guideline consultant...retained early on in the

proceedings...."  Doc. 1465, Ex. F.

Defendant does not dispute further dispute counsel's representation that he was repeatedly advised of the extent of his sentencing exposure.  He focuses instead on counsel's advancement of a position which was rejected by every court which considered it, namely, that under *Apprendi*, Defendant's sentence could not be enhanced by the Court for monetary losses not found by the jury or for a managerial role in the conspiracy which was not raised in the indictment.  Counsel's diligent attempts to persuade the courts to accept his interpretation of *Apprendi*, an interpretation which was later advanced in *Blakely* and *Booker*, is hardly deficient performance.

     H.     Failure to move for new trial based on use of perjured testimony at trial.

The record flatly belies this allegation.  In his motion for new trial, counsel specifically alleged that the Government either knew or should have known that two of Defendant's co-defendants, Arthur Householder and Larry Sangaree, had "conspired and concocted perjurious statements [against Defendant]...in the hopes of pleasing the Government so as to receive special jailhouse privileges...special contact visits...and ultimately, of having the Government file a motion under either...5K1.1...or Rule 35...."  Doc. 754.  The fact that the motion was denied does not render counsel's performance deficient.

     I.     Compromise of defense.

In this ground, Defendant charges that counsel compromised his defense "by giving the Government his trial strategy and failing to list a vital expert witness in a timely manner."  Doc. 1457, Mem. at 36.  As to the expert, the Eleventh Circuit, while admittedly in a different context, determined that Defendant was not prejudiced by the Court's exclusion of the expert witness, James McNulty.  Petrie, 302 F.3d at 1288-89.  According to the Eleventh Circuit, "Professor

McNulty's testimony would have simply provided the jury with background information regarding financial matters...[and his] exclusion...when viewed *in pari materia* with the testimony of the cooperating witnesses" did not prejudice his substantial rights. *Id*. at 1289.

Thus, even if counsel were deficient in failing timely to disclose McNulty to the Government, he cannot show that the outcome of the proceedings would have been different if McNulty had testified. Thus, he has not established prejudice under *Strickland*.

With regard to the contention that counsel damaged his defense, Defendant provides the Court only with counsel's letter advising him that the letter he sent to a co-defendant's counsel should not have likewise been sent to the Government, Doc. 1457, Ex. M, but fails to explain the contours of his allegation. Counsel, however, in his response affidavit, advises that the subject correspondence "concerned the theories of admissibility of an intercepted telephonic conversation between co-defendant Kaylan Nagel and one of the lead agents in the case." Doc. 1465, Ex. F. During trial, the Court conducted a hearing on the admissibility of the surreptitiously made tape of a telephone conversation between co-defendant Nagel and Mickey Pledger, Doc. 950 at 4-31, and denied its admissibility on a number of bases, not the least of which was a finding that the tape was not relevant to the issue of Defendant Petrie's guilt or innocence. Doc. 724. Rosenbaum acknowledges that while "there was no need to notify the government of the issue at [the] time [of the letter, approximately February 4, 2000]," eventually, it had to be disclosed to the Government when counsel tried to introduce the tape into evidence, and thus,"no harm occurred as a result of the [premature] disclosure." *Id*.

Defendant does not dispute counsel's representation regarding the contents of the misdirected letter, and thus, while counsel may have acted deficiently in "letting the cat out of

the bag" about his discussions with other counsel regarding the admissibility of the intercepted phone call, the Court cannot discern (and Defendant has not pointed out) how he was prejudiced by counsel's actions, as the tape was of no consequence to Defendant's defense as a whole.  In the end, the Court found the tape was irrelevant, and regardless of any other arguments, "[e]vidence which is not relevant is not admissible."  Fed. R. Evid. 402.  Thus, regardless of the Government's insight into counsel's thought processes on this one issue, Defendant's defense was not harmed, to the extent necessary to establish prejudice under *Strickland*.

> J.      Failure to raise on appeal due process claim based on Government's intimidation of witness.

During the course of trial, Defendant attempted to call Donald Jake Gamble as a witness. Mr. Gamble asserted his Fifth Amendment right against self-incrimination.  Doc. 949 at 44-47. Mr. Gamble advised the Court that although his plea agreement with the Eastern and Middle Districts of Tennessee and the Northern and Southern Districts of Florida required him to testify if the Government called him, he intended to invoke the Fifth Amendment if called by any defense attorney.  *Id*. at 45-46.  Mr. Gamble explained that the statute of limitations had "not run in any district that this scheme was run in, and in any state court or any federal district."  *Id*. at 46.  After Gamble's proffer, the Government advised the Court that its position was

> that he has violated that plea agreement by providing untruthful testimony, by providing untruthful information.  And...there's another matter that I really would need to go in camera about.  But, at the very least he has violated the plea agreement, I can say on the record, by providing what we believe to be incorrect information.
>
> * * *
>
> If he testified consistent with some information we have received, I would be prepared to present that case for prosecution.

*Id.* at 48.  In response, Mr. Rosenbaum argued:

> [W]e believe this is all a government subterfuge, that what they are doing is, as soon as they found out that Mr. Gamble had given sworn testimony to one of the defense lawyers, when questioned by Mr. Vipperman back on July 29th of 1999,[4] we believe that the government is now making up some investigation that is not a real investigation in an attempt to prohibit the defense from exercising their right to a compulsory process to get Mr. Gamble to testify concerning matters that would help exonerate my client.

> The jury has already heard that Mr. Gamble was an active informant as far back as 1989....What I would intend to argue with regards to Mr. Gamble is that once he became a cooperating informant, meeting with the FBI, and meeting with other members of law enforcement, that law enforcement knew about the bank that he started, knew about these syndication agreements, and tacitly gave them their blessing by allowing them to go on.

> It's a form of entrapment.  It's outrageous governmental misconduct, and we believe, number 1, that you should take the government in camera to see and make a determination of whether there is a real threat of prosecution or whether there isn't.

> Secondly, we believe, and for record purposes I'll pass up Defendant's 101, which is the sworn statement of Donald Jake Gamble that was given over two days to Mr. Vipperman.

> I would also like to pass up to the court a copy of an article that appeared in the Nashville Scene newspaper.  And the article itself states that Mr. Gamble related, in more than 20 hours of interviews to the Nashville Scene, exactly what went on here.  And it even mentioned the Northern District of Florida and talks about the very same people that this jury is being told about.

*Id.* at 52-53.

The Court then conducted an *in camera* hearing on the issue and concluded that Gamble had "very good reasons to fear that if he proceeds that he would be subject to prosecution by the Government."  *Id.* at 54.  The Court next addressed the question of whether Gamble had waived

---

[4]Lloyd Vipperman represented Lawrence "Larry" Glenn Sangaree, Jr., in a related case, Cause No. 1:97cr27-MMP (N.D. Fla.).

his right against self-incrimination right by speaking to Mr. Vipperman in the related case and to the newspaper, and Rosenbaum asked the Court to grant Gamble judicial immunity:

> I know that it's not commonly done.  But you have the power to do it.  That would insulate him.  I seems patently unfair that if the Government is going to call him that he's going to give information that would help exonerate my client, but if I call him, he asserts the Fifth.  I believe that that violates my clients' rights to due process.

*Id*. at 56.  The Court rejected that suggestion, and Rosenbaum proceeded with his waiver argument.  *Id*. at 57-58.

Later, the Court entered an Order finding that Gamble could properly assert the Fifth Amendment and had not waived his Fifth Amendment rights.  Doc. 721.  The Court found the subject interview and statement were not otherwise admissible under any exception to the hearsay rules.  *Id*.

Defendant now complains that counsel acted ineffectively by failing to bring these issues forward on appeal.  Doc. 1457, Mem. at 37.  According to Defendant, Gamble had testified in the sworn statement in the related *Sangaree* case that "Yen Bond and reinsurance agreements were legitimate funding sources" and that "had any venture capital borrower complied with the contract and obtained the necessary Letter of Credit, the project would have been funded."  *Id*. at 37-38.  Gamble also stated in this statement that he "was led to believe by the FBI that what he was doing with venture capital was legal and legitimate and that he did not learn until 1997 that the Government  considered "what he was doing an illegal advance fee scheme."  *Id*. at 38. Nevertheless, according to Defendant, Gamble stated that he "was certain they were not involved in a fraud."  *Id*.

Defendant also points to Gamble's earlier testimony in a "similar," unrelated case, *United*

*States v. Glasscock*, Cause No. 1:99cr15-MMP (N.D. Fla.),[5] in which "there was no mention of

any impending investigations" or "threat of prosecution," as evidence that the Government acted

outrageously in this case when it "withdrew [Gamble's] immunity and clearly intimidated him if

he testified on [Defendant's] behalf...." *Id*. at 38-39. According to Defendant, he needed

Gamble's testimony to impeach Larry Sangaree's credibility, "to explain the funding Gamble

made available to [Defendant] through Sangaree," and "to establish that every one of the

business contracts could have and would have been complied with if the borrower had not

defaulted." *Id*. at 38.

In response, counsel states that he and co-counsel did not believe that the issue of the

"government's intimidation" of Gamble "was established in the record," and "because the Initial

[Appellate] Brief was already close to the word count/line count maximum, the issue was not

raised." Doc. 1465, Ex. F.

As the Government pointed out in a response it filed addressing whether the Court should

unseal Gamble's *in camera* testimony, the co-defendants and witnesses who testified in other

trial proceedings

> took the stand and testified under oath that they had no intent to commit fraud or
> launder money and no knowledge that they or any of the other members of the
> group were doing so....The members of the jury who heard that testimony...did
> not believe the defendants or witnesses in this regard as none of the defendants on
> trial were acquitted. The admissible evidence available to the government
> regarding [instant] defendant's intent, knowledge and guilt was greater than that
> of the co-defendants who went to trial....Thus, even if Gamble had testified in the
> manner in which the defendant expected, his testimony would not have been
> significant enough to create a reasonable doubt.

---

[5]The *Glasscock* case was not "similar" to this case, as suggested by Defendant, as it
involved a drug conspiracy, not a money laundering conspiracy.

Doc. 924.  The Court agrees with this assessment and with counsel's that there was no evidence that the Government "intimidated" Gamble into invoking the Fifth Amendment.  Thus, even if counsel should have pressed the due process issue on appeal, Defendant was not prejudiced by this failure, as there is not a reasonable probability that the outcome of the appeal  would have been different, i.e., there is not a reasonable probability that Defendant would have been successful on appeal if counsel had pursued the matters just noted.

      K.       Failure to investigate Gamble and his associates.

      Finally, Defendant claims that counsel was ineffective for failing to investigate Gamble and his associates "knowing that Gamble was a key witness to the defense."  Doc. 1457, Mem. at 40.  According to Defendant, an investigation into Gamble and his business contacts "would have shown that [Defendant] had a 'good faith' basis for reliance on Gamble and Sangaree as being legitimate...."  *Id*.  After Gamble asserted the Fifth Amendment, "a proper investigation would have given [Defendant] a host of alternative witnesses who could have testified to the credibility of availability of huge asset pools which Sangaree testified did not exist."  *Id*. at 41.  Defendant does not identify who comprised this "host of alternative witnesses."

      In response, Rosenbaum states that he did in fact "research[ ] and investigate[ ] Donald "Jake" Gamble extensively."

      Even if the Court assumed arguendo that counsel was derelict in his investigation of Mr. Gamble and his activities and associates, it does not believe that even a "host of alternative witnesses" would have altered the outcome of the proceeding.  Every non-cooperating co-defendant and witnesses who testified on behalf of the Government asserted their good faith belief that they were not committing fraud and that there were legitimate funding sources.  None

was believed.  Thus, it is highly unlikely that further testimony from even a "host of alternative witnesses" on Defendant's behalf would have led to a different result.  In short, Defendant cannot establish prejudice.

V.      Illegal sentence.

In his final claim for relief, Defendant reasserts his argument that his sentence violates *Apprendi*, *Blakely*, and *Booker* because the Court relied on facts not found by the jury or admitted by him in imposing a sentence above the maximum permitted by the verdict.  Doc. 1457, Mem. at 43.

For the reasons previously stated in Section III, this claim is without merit.

## CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's third amended motion to vacate, Doc. 1457, be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this   *15th*  day of June, 2007.


*S/ A. KORNBLUM*
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**